UNITED STATES *v.* NELSON BEAD Co. (No. 4806) [1]

United States Court of Customs and Patent Appeals, April 28, 1955

*Warren E. Burger*, Assistant Attorney General (*Richard E. FitzGibbon* and *Daniel I. Auster*, special attorneys, of counsel), for the United States.
*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for appellee.

[Oral argument October 15, 1954, by Mr. Auster and Mr. Mandell; reargued April 5, 1955, by Mr. Auster and Mr. Mandell]

Before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, COLE, and JACKSON (retired), Associate Judges [original argument before O'CONNELL, Acting Chief Judge, and JOHNSON, WORLEY, and COLE, Associate Judges]

WORLEY, Judge, delivered the opinion of the court:

Here the Government appeals for a review of the judgment of the United States Customs Court, Second Division, A. R. D. 36, one

[1] C. A. D. 590.

judge dissenting, affirming that of the single judge sitting in reappraisement, which held the dutiable value of glass prisms exported from Czechoslovakia to be the export value defined in section 402 (d) of the Tariff Act of 1930, and did not include the item described on the invoice as a "15% buying commission."

Section 402 (d) reads:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The instant merchandise was ordered from Czechoslovakia in October 1946 and shipped the following month. Entry was made in January 1947 at the port of New York on the basis of the invoice unit values, plus 3 per centum for cases and packing. Appraisal was made at the invoice unit values, plus 15 per centum buying commission, less 2 per centum cash discount, plus 3 per centum for cases and packing.

It is agreed the sole issue is whether the 15 per centum buying commission should properly be considered a part of the dutiable value of the merchandise.

The record consists of the testimony of two witnesses for the importer, five for the Government, and numerous documentary exhibits submitted by both parties.

From that record it appears that in the purchase of crystal lighting glassware such as that at bar, American buyers enlist the services of Czechoslovakian commissionaires who take prospective purchasers from one factory to another, help them transact business with the manufacturers, receive the purchased goods, inspect them, prepare invoices, and handle other details in connection with exportation of the merchandise to this country. For those services they receive a commission from the importer of 15 per centum of the invoice unit prices charged by the manufacturer. The commissionaires represent the purchasers only, are paid by them, are recognized by the manufacturers as representatives of the purchasers, and are not retained either directly or indirectly by the manufacturers, nor do they receive from the latter any fee or other compensation. The record also discloses that, although the foregoing appears to be the prevailing system in Czechoslovakia and the method by which the instant merchandise was purchased, the manufacturers may, and on occasion do, sell directly to American buyers for exportation to the United States without the intervention or services of a commissionaire. On those

occasions, sales of merchandise such as that involved here, packed ready for shipment to the United States, are made at the invoice unit prices plus a commission of 15 per centum for "export service rendered" by the manufacturer, with the commission item generally invoiced separately.

It is the Government's position here, as below, that the evidence of record is to the effect that the merchandise is *not* freely offered for sale in the ordinary course of trade to *all* purchasers for export to the United States at unit invoice prices, but *is* so offered at invoice unit prices plus 15 per centum; therefore, the latter item, by whatever name known, is not a *bona fide* buying commission, but is properly a part of the dutiable value of the goods.

The trial court was of the opinion the evidence submitted by the Government did not support its allegations; found that the "preponderance in weight of the evidence" disclosed that in the usual and ordinary course of trade sales were made through commissionaires; that direct sales were fugitive and occasional in nature; and concluded that the 15 per centum item in dispute was a *bona fide* commission which, as such, formed no part of the export market value of said merchandise, citing *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T. D. 40958; and *United States* v. *Alfred Kohlberg, Inc.*, 27 C. C. P. A. (Customs) 223, C. A. D. 88.

A majority of the appellate division affirmed the trial court, adding that even though direct sales could be considered to have been made in the usual course of trade, still the manufacturer's commission did not accrue until after the goods were in condition, packed ready for shipment to the United States, and, therefore, was not properly a dutiable item.

As the case comes here, we find no material differences between the parties as to the facts, but rather as to the conclusions of law to be drawn therefrom.

It is, of course, well established that in matters of reappraisement the jurisdiction of this court is limited to questions of law only. As stated in *United States* v. *Eurasia Import Co., Inc.*, 33 C. C. P. A. (Customs) 123, C. A. D. 326, this court is bound by the findings of facts of the Customs Court if there be any substantial evidence to support such findings. We do not pass upon the credibility of witnesses, nor weigh the evidence in case of conflict, those being matters to be determined exclusively by the tribunals of the Customs Court. The latest expression thereon is found in *H. S. Dorf & Co., Inc., et al.* v. *United States*, 41 C. C. P. A. (Customs) 183, C. A. D. 548, wherein the court, through O'Connell, Judge, said:

* * * Moreover, the predominant question of law to be determined here [and] in all such [reappraisement] cases is whether any substantial evidence exists in the record to support the controlling findings of fact relied upon by the judge

or judges of the Customs Court. *United States* v. *Semon Bache & Co.*, 27 C. C. P. A. (Customs) 89, C. A. D. 67; *Brooks Paper Company* v. *United States*, 40 C. C. P. A. (Customs) 38, C. A. D. 495; *United States* v. *Henry W. Peabody & Co.*, 40 C. C. P. A. (Customs) 59, 65–66, C. A. D. 498.

Thus the issue here is whether, as a matter of law, there is substantial evidence to support the judgment below. More particularly, whether there is substantial evidence to support the findings of the court that sales made through commissionaires are those contemplated by the provisions of section 402 (d), *supra.*

In determining that question it is necessary to examine the evidence from which that conclusion was drawn by the tribunals below. In support thereof, the courts referred to the following testimony of two witnesses called by the Government and two called by the importer.

For the importer:

Q. Mr. Nelson in the 30 years you have done business in Czechoslovakia, particularly with reference to prisms, have you ever conducted any business without a commissionaire?

A. I will say 99% of my business—all my purchases and all my records were always through a commissionaire.

Mr. Wilowski: Object and move that it be stricken as not responsive.

Chief Judge Oliver: I will let it stand. I don't know how he can answer any other way than that.

Mr. Wilowski: His question was "did you ever make any purchases?".

Chief Judge Oliver: Let him answer the question again or ask it again.

Q. Did you ever make any purchases from the manufacturer without the commissionaire?

A. I did.

Q. When—

A. But always the commissionaire got a copy and he handled the order—if the commissionaire was sick or busy—but always through a commissionaire.

Q. Were the prices on the invoice, are those the prevailing prices in Czechoslovakia during that period on the date of exportation?

A. They were the prices.

Q. Were you familiar with the quotations you received—offers from other manufacturers—for these same kind of goods?

A. We were always receiving offers at similar prices—sometimes lower and even higher—we buy at the best prices.

Mr. Mandell: Your witness.

Cross Examination.

By Mr. Wilowski:

XQ. Mr. Nelson, you stated a few moments ago that you did purchase some of this type of merchandise directly from the manufacturer did you not?

A. Yes.

XQ. At what prices did you purchase it?

A. Same prices.

XQ. Did you have to pay at that time the 15% in addition to the invoice prices?

A. No, sir.

XQ. Was the 15% included in the invoice prices?

A. The 15% was paid only to the commissionaire for his part of the clerical work that he had to do.

XQ. Did you ever purchase from a manufacturer less the 15%?

A. No.

Chief Judge Oliver: I think that leaves the record in a state of confusion. As the record now stands it looks as though the facts as he knows them to be are not so. He bought from the factory at the unit prices and then paid his commissionaire 15%. He didn't deduct 15% from the manufacturer. Even if he bought direct from the manufacturer on one or two occasions he still paid his commissionaire 15% after the order was placed, is that correct?

Witness: Yes.

### Another witness for the importer:

Q. And will you please describe to the Court how you conducted your business in buying this merchandise in the Czechoslovakian market?

A. Well, when I arrived in Czechoslovakia I went to the town of Gabloz and met my commissionaire and told my commissionaire the type of merchandise I wanted and he took me to the various factories that made this type of merchandise and the merchandise that I wanted I told my commissionaire to place and order. He got an order out on his order copy and I signed it and one copy was given to me and one delivered to the factory and one copy the commissionaire kept.

Q. Did you pay your commissionaire for his services?

A. Yes, I did. All these invoices and prices actually were paid to the factory only and when the commissionaire billed the goods he added on his 15% commission for his services.

Chief Judge Oliver: Whom did you pay for this merchandise, the commissionaire or the factory direct?

Witness: The commissionaire.

Q. And is that the way business is done as far as you know?

A. Yes.

Chief Judge Oliver: Who billed the merchandise. The Factory or the commissionaire.

Witness: The commissionaire.

Q. Is that the way the business has always been conducted?

A. As far as I know that is the way business is conducted.

Q. Business is always conducted through the commissionaire; letters of credit go to the commissionaire?

A. Yes.

Mr. Wilowski: I would like to have that clarified. Do you mean his business or the business generally.

Q. His business and the trade generally.

Mr. Wilowski: I object to what the business of the trade is.

Chief Judge Oliver: You have testified to your own dealings, have you—from what sources have you secured information as to the general trade as to the manner in which business is conducted?

Witness: I met a number of importers of this type of merchandise and they all told me they do business the same way I do. In fact, I was familiar with the way they do business before I went into business for myself. I knew they followed the same type of procedure.

A Mr. Levin, called by the Government, testified that prior to 1948 he had always bought through a commissionaire and had made no

effort to buy directly from the Czechoslovakian manufacturers. Part of his testimony follows:

XQ. But up until that time [1948] I want you to describe to the Court the ordinary course of doing business in the lighting glassware industry?

Mr. Wilowski: I object to it, I don't think the witness is qualified.

XQ. As far as you know?

Mr. Wilowski: I object, I don't think the witness is qualified to testify what the ordinary course of trade is.

Chief Judge Oliver: Do you know what the ordinary course of trade was?

Witness: In our industry, I definitely know.

Chief Judge Oliver: How do you know.

Witness: I am considered one of the major importers of that merchandise and am very friendly with competitors and the way of doing business.

Chief Judge Oliver: In your general contact with fellow importers, it was your business to know what the trade, the general trade was?

Witness: Yes, sir.

XQ. Will you please describe that ordinary course of trade?

A. Well, due to the fact that my business is generally done with small manufacturers—probably bought from seventy-five to one hundred different people—I always went to a commissionaire and have him take care of our interests in that area. We went there either in person and placed orders direct with the manufacturers through a commissionaire or mailed or cabled orders to the commissionaire requesting him to place those purchases with the best possible manufacturer based on his ability to deliver the best kind of merchandise at the price and he would then place the orders with the various manufacturers and subsequently make shipment of the goods and pay the manufacturer out of the credits issued.

Chief Judge Oliver: We have used the word "manufacturers". What is the type of manufacturer of this glassware, these various articles in the Gablonz area or district?

Witness: They are small factories, hand workers.

A Mr. Albert, also called by the Government, testified as follows:

XQ. Mr. Albert, were you in Czechoslovakia in the latter part of 1946?

A. Yes.

XQ. While you were there you familiarized yourself with the market conditions prevailing and the method of doing business particularly with reference to prisms and lighting glassware?

A. Yes, sir.

XQ. Will you please describe to the Court the method that you employed in doing your business?

A. I came to Czechoslovakia and met Mr. Schonbek—

Chief Judge Oliver: Who is he?

A. My commissionaire.[1] He took me to all my factories and I made my selections and left the orders with him for the various factories and the various lines and opened up a letter of credit in favor of Mr. Schonbek with the instructions in the letter of credit that all payments are to be made upon receipt of consular invoice from the factory and he was to okay these payments to them. In other words, no shipment was to be paid for unless examined, checked, packed by Mr. Schonbek; then he could draw the money and pay these manufacturers.

---

[1] Also a manufacturer of complete chandeliers.

That was our understanding and so expressed in the letter of credit by our bank which can be verified.

XQ. Did you pay Schonbek a commission for his services?

A. 15%.

XQ. What services did he render you?

A. He took me to the factories in his own car; spent days with me in selecting the merchandise, advising me where I could get the best merchandise at the best prices. He supervised the packing, particularly in my case because I had them packed a little bit different than other manufacturers had them packed and in some instances paid a little more money for them too. He supervised that packing and saw that it was shipped so that I got everything I ordered and for that service he received 15%.

XQ. Are you familiar as president of this association and from your experience in Czechoslovakia and the United States as to the method of doing business in Czechoslovakia?

A. I am, most every order is placed the same way by all, regardless of the importer.

Mr. Wilowski: I object to that as not responsive and move that it be stricken. The latter part of the answer.

Chief Judge Oliver: That part may be stricken.

XQ. How is business done? Is it done through commissionaires or through the manufacturers direct?

A. With commissionaires.

Mr. Wilowski: Object to that.

Chief Judge Oliver: Objection overruled.

XQ. What percentage of business is done through commissionaires?

A. I would say all of it—maybe in an isolated case on something special which is not in the regular line you may not need the commissionaire's services. Even then if shipment is made on a special basis that would have to go through the commissionaire and he would have to get his commission.

Mr. Wilowski: I move the answer be stricken as not responsive; furthermore, I don't think he is qualified as to how others do business in Czechoslovakia.

Chief Judge Oliver: Objection overruled.

XQ. And that has been true for how many years?

A. Thirty-five years.

Also of record on behalf of the importer is an affidavit of one Josef Benes, manager of the company which manufactured and sold the instant merchandise, to the effect that such merchandise was freely offered for sale at the factory, packed ready for shipment to all purchasers in the usual wholesale quantities in the ordinary course of trade for export to the United States at the same prices and upon the same terms provided appellee herein, i. e., at the invoice prices.

The evidence offered by the Government relates primarily to direct sales. We take the liberty of quoting at some length from the decision of the Customs Court with respect thereto:

In connection with direct sales by the manufacturer, defendant's collective exhibit 4 contains a communication from the Economic Group of the Glass Industry of Czechoslovakia, in answer to an inquiry posed by the appraiser at New York and forwarded by the Czecho-Slovak Crystal Importers Association,

Inc., an American association of importers of glass prisms, of which all of the trade witnesses in the instant case are members, in which the following is stated:

2. If a Czechoslovakian manufacturer supplies an importer direct, without the intervention of a commissionaire, he, as a rule, also charges a 15% advance under the title of "15% advance for export service rendered." If, for instance, a chandelier trimming item is sold by the manufacturer in the home market at the price of 100, he will, by transacting the export business direct, have to cover his overhead expenses accruing by the export business, namely in such a way that he puts on the price of 100 a 15% advance for export service rendered. By this selling advance the export overheads of the manufacturer are being covered which, as a matter of fact, are omitted for an inland business.

Defendant's collective exhibit 5, a communication from A. Schonbek & Co. of Smrzovka, Czechoslovakia, both a manufacturer and a commissionaire, to I. Albert Co., of which defendant's witness, Isaac Albert, is a partner, also reveals the practice obtaining with respect to direct sales. It states:

The merchandise made by ourselves we shall invoice hereafter as follows: We are charging the ground prices like on merchandise we are purchasing from manufacturers and add the 15% selling advance separately at foot of the invoice, under the title "15% advance for export service rendered".

This proposition was worked out by our Ministry for foreign trade, who most likely represents the stand-point that the 15% advance for export service rendered is to be considered as a non-duty item and that, therefore, from a custom technical point of view, it will be the same for the American Importer whether he purchases from the manufacturer direct, or through the intermediary of an Exporter.

We do hope that the American Customs will represent the same standpoint as our Ministry for foreign trade.

It should be considered as logical that the 15% advance has not to be paid duty on as, de facto, it does not represent any additional profit but a remuneration for the expenses involved with the settlement of the export transactions, which the manufacturer has to bear likewise, if he exports directly and for which the exporter gets a remuneration in the way of a commission of 15%.

It further appears from a price list of the firm of A. Schonbek & Co., dated March 5, 1946, defendant's exhibit 8, that subsequent to the war, but prior to July 1946, when the practice outlined in defendant's collective exhibits 4 and 5 was initiated, merchandise of the type here involved was offered for sale by the manufacturer at unit prices which were inclusive of a 15 per centum commission. We think, however, that it is sufficiently established that at and prior to the time the instant merchandise was exported the 15 per centum commission for export services rendered was separately invoiced. Moreover, it is clear to us that this method of invoicing was open and aboveboard, and constituted a *bona fide* endeavor to present the question of the dutiability of this item to our customs officials.

Examination of the record and decisions below makes it clear that both tribunals meticulously examined and carefully evaluated all of the testimony and documents submitted by the parties. Thereupon, the majority of the Appellate Division summarized its conclusions as follows:

We are of opinion that the weight of the evidence sustains the finding that direct sales by the manufacturers were not made in the ordinary course of trade, and that the usual and ordinary method of purchasing glass prisms was through the intervention of a buying agent who received a *bona fide* buyer's commission for the services he rendered in facilitating delivery to his principal of the goods which were ordered in the foreign market. Some more compelling evidence than two isolated instances of direct sales of such or similar merchandise, (defendant's

exhibits 6 and 7,) an outmoded price list, defendant's exhibit 8, and a practice for handling such sales when, and if, they occurred, would be necessary to counteract the effect of the convincing testimony of plaintiff's witnesses Nelson and Gottesman and defendant's witnesses Levin and Albert. Nelson testified that "99% of my business—all my purchases and all my records were always through a commissionaire." Gottesman's business was always conducted through a commissionaire. Levin, one of the major importers of such and similar merchandise, stated that prior to 1948 he made no attempt to buy from a manufacturer directly. As for Albert, except in isolated cases, all of his business was transacted through commissionaires.

Whether a buying commission is *bona fide* depends upon the facts of each particular case. *United States* v. *Bauer et al.*, 3 Ct. Cust. Appls. 343, T. D. 32627.

While we have been unable to find a case precisely in point with the facts here, we are of the opinion that the judgment of the court below that sales of merchandise such as that at bar are in harmony with those contemplated by the provisions of section 402 (d), and is clearly supported by substantial evidence.

Congress did not write the above section in such a fashion as to require merchandise to be freely offered for sale to *all purchasers* without limitation, but added qualifying language that such offers should be, *inter alia*, "in the ordinary course of trade." The Customs Court found that the involved sales through commissionaires were so made. That finding is supported by substantial evidence.

So far as the instant item is concerned, the record leaves no doubt that the merchandise was purchased through a commissionaire who performed services on behalf of the importer; that the commissionaire acted as a buying agent and received from the importer a commission of 15 per centum for services rendered; and that none of said commission inured to the manufacturer. While that item adds to the cost of the merchandise to the importer, the facts here convince us that it is a *bona fide* buying commission and, as such, does not enter into the dutiable value of the merchandise.

As previously stated, whether a buying commission is dutiable depends upon the facts involved. In our opinion, the evidence in this particular controversy supports the judgment below.

*Affirmed.*

JACKSON, Judge, retired, sat in place of GARRETT, Chief Judge.

---

JOHNSON, Judge, dissenting.

Section 402 (d) of the Tariff Act of 1930 is set forth in the majority opinion. The portion which I deem determinative of the issues here is emphasized by the italicized part thereof which follows:

\*      \*      \*      \*      \*      \*      \*

Export Value—The export value of imported merchandise shall be the market value or the *price, at the time of exportation* of such merchandise to the United

States, at which such or similar merchandise is *freely offered* for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the *ordinary course of trade, for exportation to the United States* * * *

\*     \*     \*     \*     \*     \*     \*

It is my opinion that when the facts of this case are viewed in the light of the above italicized portions of the statute, the conclusion is inescapable that the 15% commission which is claimed by the importer as being non-dutiable, is in reality a part of the *"price, at the time of exportation of such merchandise to the United States,"* and in reality is a part of the *freely offered price* of the imported merchandise, *for exportation to the United States,* and should therefore be dutiable. The uncontradicted facts show that the price to the importer cannot, under any circumstances, be less than the manufacturer's price plus 15%, whether a "commissionaire" is or is not employed.

I feel that the decision in this case should be controlled by the reasoning set forth in *United States* v. *Hermann*, 91 F. 116 (C. C. A. 2nd 1898) since it is very similar to the present case. The facts of the *Hermann* case, which are pertinent to the present case, are succinctly set forth in the following quoted portion thereof:

The importations were manufactured in England by Firth & Sons, and sold by them to Henry & Co., of Bradford, commission merchants, at a price which may be called the invoice price, less a discount of 5 per cent. The importers purchased the goods of Henry & Co., paying them the invoice price, including the discount. The invoices upon which the importations were entered in this country were made up by a statement of the manufacturer's price to the English seller, and a deduction of 5 per cent. discount. The discount represented a commission or profit allowed by the manufacturers to the seller for handling and marketing the goods, and paying for them in advance. The importers claim, and it is now contended for them, that this discount is a commission which should have been deducted from the manufacturer's price, or the invoice price, upon appraisement, in ascertaining the dutiable value of the importations.

The court's reasoning in the *Hermann* case is quoted below:

\*     \*     \*     \*     \*     \*     \*

* * * it was quite competent for the board to conclude that what was called "commissions" was merely an arbitrary item, which really represented a part of the market price of the goods to the ordinary purchaser in the foreign market, that a special *discount* was allowed to commission merchants, *that the real market price of the goods was the price which ordinary purchasers buying of commission merchants were obliged to pay,* and that the invoice price was composed of manufacturer's price and discount in order to permit the importer to insist that the item of discount called "commissions" was not a part of the price of the goods, and should be deducted therefrom. * * * [Italics added]

\*     \*     \*     \*     \*     \*     \*

* * * The evidence before the board of general appraisers impresses us with the conviction that the item of "commissions," so called, is not entitled to cut any figure in the case, except as a trade device to mislead the customs officers, and be made the basis of a claim for a deduction from the real wholesale price.

The majority is of the opinion that "there is substantial evidence to support the decision of the Customs Court" while I am of the opinion that there is no evidence, substantial or otherwise, to support the decision of the Customs Court, but rather that the evidence fully supports this dissent as is hereafter set forth.

There is no conflict in the evidence. It shows conclusively that if an importer purchases directly from the manufacturer he is charged an additional "15% advance for export services rendered," which the evidence shows is to cover the manufacturer's "overhead expenses accruing by the export business, namely in such a way that he puts on the price of 100 a 15% advance for export service rendered. By this selling advance the export overheads of the manufacturer are being covered which, as a matter of fact, are omitted for an inland business."

The evidence also conclusively shows that if an importer purchases through a "commissionaire" 15% is added for his commission. There is no dispute as to the facts. The sole question involved is one of law, i. e. whether the 15% added regardless of whether the purchase is made direct from the manufacturer or through a "commissionaire" should be included for duty purposes.

After a careful review of the facts in the light of the statute and the above cited decision, I feel that the 15% of the purchase price, here in dispute, is a dutiable item since the ultimate price to the importer is the same whether the purchase is made directly from the manufacturer or indirectly through a "commissionaire." In other words, the importer can *not* under any circumstances purchase the merchandise for *exportation to the United States* unless he pays the manufacturer's price plus 15%. The payment of this 15% is not optional with the importer; it is mandatory. Thus, stating the facts in terms of the statute, the *freely offered price in the ordinary course of trade for exportation to the United States* is the manufacturer's price plus 15%. I therefore feel that the 15% commission should be considered part of the dutiable value of the merchandise.

In view of the foregoing, it is my opinion that the decision of the Customs Court should be *reversed*.

O'CONNELL, J., concurs in the dissent.